133 F.3d 416
 21 Employee Benefits Cas. 2249,
Pens. Plan Guide (CCH) P 23940B
 Karl GRINDSTAFF, Individually and as a Member, North
American Rayon Corporation/North American Corporation ESOP
Administrative Committee; Bill McKinney, Ray Davis, Roy
Miller, Gary Williams, and Shirlene White, on their own
behalf and on behalf of others similarly situated as
Employee Owners of North American Corporation/North American
Rayon Corporation, and as Participants and Beneficiaries of
North American Rayon Corporation/North American Corporation
ESOP; and United Textile Workers of American, AFL-CIO, CLC
and its subordinate Local Union Nos. 2207 and 2614,
Plaintiffs-Appellants,
v.
Charles GREEN, President and Director, North American
Corporation and Member, North American Rayon
Corporation/North American Corporation ESOP Administrative
Committee; Tony Butts, Vice President and Director, North
American Corporation and Member, North American Rayon
Corporation/North American Corporation ESOP Administrative
Committee; William E. Andersen, Director, North American
Corporation; David Henry, Director, North American
Corporation; North American Corporation, a Tennessee
Corporation; North American Rayon Corporation, a Tennessee
Corporation, Defendants-Appellees,
First American National Bank, in its capacity as Trustee of
the North American Corporation Employee Stock
Ownership Plan, Defendant.
 
 No. 96-5628.
 United States Court of Appeals,
Sixth Circuit.
 Argued Aug. 7, 1997.
Decided Jan. 8, 1998.
 David M. Cook (briefed), Manley, Burke, Lipton & Cook, Cincinnati, OH, Donald F. Mason, Jr. (briefed), D. Bruce Shine (argued and briefed), Shine & Mason, Kingsport, TN, for Plaintiffs-Appellants.
 David Randolph Smith (argued and briefed), David Randolph Smith & Associates, Nashville, TN, for Charles Green, Tony Butts, William E. Andersen and David Henry.
 Judge B. Wilson, II (briefed), Penny R. Warren (argued), Gayle B. McGrath (briefed), Wyatt, Tarrant & Combs, Lexington, KY, for North American Rayon Corporation.
 James L. Craig, Jr. (briefed), U.S. Department of Labor, Washington, DC, for Amicus Curiae.
 Before: KRUPANSKY and SUHRHEINRICH, Circuit Judges, ROSEN, District Judge.*
 ROSEN, J., delivered the opinion of the court, in which SUHRHEINRICH, J., joined. KRUPANSKY, J. (pp. 426-33), delivered a separate dissenting opinion.
 
 
 1
 ROSEN, District Judge.
 
 
 2
 This is an ERISA "breach of fiduciary" action brought by employees of North American Rayon Corporation ("NAR") and their Union, the United Textile Workers of America, against members of the Board of Directors of North American Corporation ("NAC"), the parent company of NAR; members of the NAR Employee Stock Ownership Plan Administrative Committee (the "ESOP Committee"); and the ESOP Plan Trustee, First American National Bank.[1] The District Court for the Eastern District of Tennessee dismissed the Plaintiffs' ERISA claims on Defendants' Rule 12(b) and (c) motions finding that Plaintiffs failed to state any legally cognizable ERISA claim for breach of fiduciary duties. See Grindstaff v. Green, 946 F.Supp. 540, 555 (E.D.Tenn.1996)[2] Plaintiffs now appeal.
 
 
 3
 For the reasons set forth below, we affirm the District Court's ruling.
 
 I. PERTINENT FACTS
 
 4
 This action centers around an Employee Stock Ownership Plan (an "ESOP"). An ESOP is an ERISA plan that invests primarily in "qualifying employer securities," which typically are shares of stock in the employer that created the plan. See 29 U.S.C. § 1107(d)(6)(A).
 
 
 5
 The ESOP plan at issue was created in 1985. The Plan called for 85% of North American Rayon Corporation to be held by an ESOP Trust, with the remaining 15% of NAR stock going to management employees. In 1990, North American Corporation ("NAC") was formed as a holding company for NAR and several related entities. With this change, NAC stock replaced the NAR stock as the stock held by the ESOP Trust. The shares of NAC held by the ESOP Trust are voted by the Trustee, First American National Bank, as directed by the ESOP Administrative Committee. This includes voting for members of the NAC Board of Directors at the company's annual meeting.
 
 
 6
 Control and management of the operation and administration of the ESOP lies in the hands of the three-member ESOP Administrative Committee which is appointed by the five-member NAC corporate Board of Directors. One of the three ESOP Committee appointees is recommended to the Board of Directors by the Union.
 
 
 7
 Defendants Charles Green and Tony Butts currently are, and at all times relevant to this action were, members of the ESOP Administrative Committee.[3] Green and Butts are also President and Vice-President of NAR and members of the NAR Board of Directors. They held these positions even before the formation of NAC. When NAC was formed in 1990, Green and Butts became President and Vice-President of the new company, and two of the members of the NAC Board of Directors. Defendant William Andersen, NAR/NAC's labor counsel and labor negotiator, is also a member of both the NAR and NAC Boards of Directors. Defendant David Henry is the fourth Director of NAC. The fifth member of the NAC Board is Raymond Broyles, the employee nominee.[4]
 
 
 8
 The four defendants who are members of the NAC Board of Directors--Green, Butts, Andersen, and Henry--have been re-elected to the Board without opposition every year at the NAC annual meeting since 1990 and, until this action was filed after a bitter two-month long labor strike at NAR in 1994, the re-election of the four Defendants was without controversy.
 
 
 9
 The ESOP was originally created in 1985 as a result of collective bargaining between NAR and the UTWA, and appears to have been, since its creation, a topic of regular labor contract negotiations. In 1991, NAR ESOP employee-participants began regularly attempting, without success, to have the terms of the ESOP amended to allow "pass-through voting", whereby each plan participant would instruct the ESOP Administrative Committee as to the manner in which shares of company stock allocated to that participant's ESOP account would be voted.[5]
 
 
 10
 Most recently, "pass through voting" was an issue in labor negotiations at NAR/NAC in 1994. In 1994, NAR employees were working under a collective bargaining agreement that expired October 4, 1994. During negotiations for a new agreement in September 1994, the Union offered to present in a positive light NAR's economic contract offer to the Union membership if NAR and NAC would agree to amend the ESOP to allow for "pass through voting". NAC labor negotiator Andersen presented this proposal to the NAC Board of Directors, but all five members of the NAC Board, including the employee-nominated Union member, Raymond Broyles, unanimously rejected the proposal. The Board members stated that the proposal was rejected because they believed that NAC's lenders would not agree to this proposal. After this "pass through voting" proposal was rejected, a bitter two-month long strike ensued. When after two months the strike did not change the company's position about "pass through voting", the UTWA unilaterally called off the strike and this lawsuit was filed.
 
 II. ISSUES PRESENTED
 
 11
 This action focuses upon the roles of Defendants Green, Butts, and Andersen as members of the ESOP Administrative Committee and the NAC Board of Directors. As indicated, Green, Butts and Andersen are all members of the NAC Board of Directors. Green and Butts are also members of the ESOP Committee. Specifically, Plaintiffs complain that the NAC Board of Directors' appointment of the ESOP Committee and the ESOP Committee's directing the vote for the NAC Board constitutes a breach of ERISA-mandated fiduciary duties to the ESOP and its participants and beneficiaries by both the NAC Board and its individual members. Underlying this complaint is the Board of Directors' refusal to accept the UTWA's contract proposal for the amendment of the ESOP Plan to provide for pass-through voting.
 
 
 12
 Plaintiffs contend that management "entrenchment" (i.e., management holding absolute control of a 100% employee-owned company) in an ESOP-owned company necessarily implicates a violation of ERISA-mandated fiduciary duties when the "entrenched" management appoints members of the administrative committee that controls the stock voting rights of the ESOP. These ERISA claims principally revolve around two alleged fiduciary violations: (1) the voting of the ESOP Plan's shares to elect the Board of Directors and (2) the Board of Director's' rejection of pass-through voting. The specific ERISA fiduciary duties alleged by Plaintiffs to have been breached in this case are set forth in Sections 1104(a) and 1106(b) of the Act.
 
 
 13
 Section 1104(a) provides, in pertinent part:
 
 
 14
 (a) Prudent man standard of care
 
 
 15
 (1) ... [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and--
 
 
 16
 (A) for the exclusive purpose of:
 
 
 17
 (i) providing benefits to participants and their beneficiaries; and
 
 
 18
 (ii) defraying reasonable expenses of administering the plan;
 
 
 19
 (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; [and]
 
 
 20
 * * *
 
 
 21
 (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter or subchapter III of this chapter.
 
 
 22
 29 U.S.C. § 1104(a)(1)(A), (B), and (D).
 
 Section 1106(b) provides:
 Prohibited transactions
 
 23
 * * *
 
 
 24
 (b) Transactions between plan and fiduciary
 
 
 25
 A fiduciary with respect to a plan shall not--
 
 
 26
 (1) deal with the assets of the plan in his own interest of for his own account, [or]
 
 
 27
 (2) in his individual or any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries....
 
 
 28
 29 U.S.C. § 1106(b).
 
 
 29
 Plaintiffs allege in their Complaint that the right to vote the NAC ESOP Plan's shares constitutes an "asset" of the ESOP, and the exercise of that right to maintain one's position as a member of the ESOP Administrative Committee and as a member of the NAC Board of Directors violates ERISA fiduciary duties. [See Plaintiffs' Complaint, p 51.] Plaintiffs contend that Defendants Green and Butts breached their ERISA fiduciary duties to discharge their obligations with respect to the ESOP Plan solely in the interest of the Plan participants and beneficiaries, and that they engaged in prohibited self-dealing by using their authority as members of the ESOP Administrative Committee to instruct Defendant First American National Bank, the Plan Trustee, to vote the 85% of the NAC stock held by the ESOP to elect Green, Butts and Andersen as members of the NAC Board of Directors.
 
 
 30
 Thus, as the District Court noted, whether or not Plaintiffs have stated an ERISA claim in this case turns, as an initial matter, on whether "stock voting rights " constitute an ERISA "plan asset". More specifically, the issue is whether the right to vote ESOP shares in a regular annual election of the corporate board of directors for the purpose of electing plan fiduciaries to the corporate board constitutes a "plan asset" within the meaning of ERISA.
 
 
 31
 A secondary issue presented is whether, when acting in their capacity as members of the NAC board of directors, the Defendant ESOP Committee members violated their ERISA fiduciary duties under Section 1104 in voting against the pass-through voting proposal.III. ANALYSIS
 
 A. STANDARD OF REVIEW
 
 32
 The standard of review applicable to motions for "judgment on the pleadings" under Fed. R. Civ. Pro. 12(c) is the same de novo standard applicable to motions to dismiss under Rule 12(b)(6). Scheid v. Fanny Farmer Candy Shops, Inc., 859 F.2d 434, 436 n. 1 (6th Cir.1988). A motion to dismiss under Fed. R. Civ. Pro. 12(b)(6) requires the Court to construe the complaint in the light most favorable to the plaintiff, accept all of the complaint's factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of the claims that would entitle relief. Meador v. Cabinet for Human Resources, 902 F.2d 474, 475 (6th Cir.1990), cert. denied, 498 U.S. 867, 111 S.Ct. 182, 112 L.Ed.2d 145 (1990).
 
 
 33
 However, the Court need not accept as true legal conclusions or unwarranted factual inferences. Morgan v. Church's Fried Chicken, 829 F.2d 10, 12 (6th Cir.1987); Westlake v. Lucas, 537 F.2d 857, 858 (6th Cir.1976). See also, Blackburn v. Fisk University, 443 F.2d 121, 124 (6th Cir.1971) (the court is "required to accept only well-pleaded facts as true, not the legal conclusions that may be alleged or that may be drawn from the pleaded facts.")
 
 
 34
 B. THE RIGHT TO VOTE THE ESOP PLAN'S SHARES DOES NOT CONSTITUTE AN ERISA "PLAN ASSET"
 
 
 35
 The starting point of our analysis is that Congress specifically recognized and approved of corporate managers also serving as ESOP fiduciaries. Section 1108(c) of ERISA specifically provides:
 
 
 36
 (c) Fiduciary benefits and compensation prohibited by section 1106
 
 
 37
 Nothing in section 1106 of this title shall be construed to prohibit any fiduciary from--
 
 
 38
 * * *
 
 
 39
 (3) serving as a fiduciary in addition to being an officer, employee, agent or other representative of a party in interest.
 
 
 40
 29 U.S.C. § 1108(c)(3).
 
 
 41
 As the Third Circuit observed in Moench v. Robertson, 62 F.3d 553 (3rd Cir.1995), the reason for exempting ESOPs from ERISA's strict prohibitions against self-dealing arises out of the distinctive dual nature and purpose of ESOPs as both a retirement plan and a means of corporate finance. The court explained:
 
 
 42
 [U]nlike the traditional pension plan governed by ERISA, ESOP assets generally are invested in securities issued by the plan's sponsoring company. In keeping with this, ESOPs, unlike pension plans, are not intended to guarantee retirement benefits, and indeed, by its very nature an ESOP places employee retirement assets at much greater risk than does the typical diversified ERISA plan....
 
 
 43
 Rather, ESOPs serve other purposes. Under their original rationale, ESOPs were described as devices for expanding the national capital base among employees--an effective merger of the roles of capitalist and worker. Thus, the concept of employee ownership constituted a goal in and of itself. To accomplish this end, Congress enacted a number of laws designed to encourage employers to set up such plans. The Tax Reform Act of 1976 was one of those statutes, and in passing it, Congress explicitly stated its concern that courts should refrain from erecting barriers that would interfere with that goal:
 
 
 44
 The Congress is deeply concerned that the objectives sought by [the series of laws encouraging ESOPs] will be made unattainable by regulations and rulings which treat employee stock ownership plans as conventional retirement plans, which reduce the freedom of the employee trusts and employers to take the necessary steps to implement the plans, and which otherwise block the establishment and success of these plans.
 
 
 45
 Tax Reform Act of 1976, Pub.L. No. 94-455, § 803(h), 90 Stat. 1590 (1976) (quoted in Donovan v. Cunningham, 716 F.2d [1455], 1466 n. 24 [ (5th Cir.1983), cert. denied, 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984) ] )....
 
 
 46
 62 F.3d at 569 (citations omitted).
 
 
 47
 In Donovan v. Cunningham, supra, the Fifth Circuit explained the court's task in interpreting and applying ERISA's provisions in ESOPs in light of Congress' intent that the ESOP be both an employee retirement benefit plan subject to most of ERISA's requirements and a technique of corporate finance:
 
 
 48
 Congress has repeatedly expressed its intent to encourage the formation of ESOPs by passing legislation granting such plans favorable treatment, and has warned against judicial and administrative action that would thwart that goal. Competing with Congress' expressed policy to foster the formation of ESOPs is the policy expressed in equally forceful terms of ERISA: that of safeguarding the interests of participants in employee benefit plans by vigorously enforcing standards of fiduciary responsibility.... [The court's] task in interpreting the statute is to balance these concerns so that competent fiduciaries will not be afraid to serve, but without giving unscrupulous ones a license to steal.
 
 
 49
 716 F.2d at 1466.
 
 
 50
 As indicated, Plaintiffs' principal complaint in the instant action is that Defendants Green and Butts violated their ERISA fiduciary duties by directing the ESOP Plan trustee to vote for them in the regular annual election of the NAC board of directors and then, in turn, once elected to the board, by appointing themselves to the ESOP Administrative Committee.
 
 
 51
 Boiled to its essence, what Plaintiffs are alleging as a violation of ERISA is really a form of "management entrenchment" by which management controls employee pension assets. However, with respect to ESOP corporations, management "entrenchment" is actually the rule, rather than the exception. O'Toole, The Disproportionate Effects of an ESOP's Proportional Voting, 85 NW. U.L.Rev. 824, 826. According to O'Toole, ESOP corporations' boards of directors select the persons who manage and control the ESOP 90% of the time. Id. at 836, n. 76. O'Toole further states that 47% of ESOP corporations also had ESOP administrators who were also officers of the sponsoring corporation. Id.
 
 
 52
 As the District Court noted, not only has Congress specifically recognized and approved of corporate managers serving as ESOP fiduciaries, but also this practice is quite prevalent in the corporate sector. Thus,
 
 
 53
 The Court must assume [that] Congress ... realized as a practical matter that ESOP fiduciaries would have ties and loyalties to management. Congress would have known that in most cases management would appoint the ESOP fiduciary and then have some control over the fiduciary's tenure. It can also be assumed that Congress was aware members of management would also serve as ESOP fiduciaries in many cases. Accordingly, we can ascribe to Congress the knowledge that ESOP fiduciaries would have ties to, and loyalty to management, and some self-interest would be inherent.
 
 
 54
 946 F.Supp. at 546.
 
 
 55
 Only two reported district court cases out of the Seventh Circuit address the issue of whether the right to vote an ESOP plan's shares is a plan "asset". In both O'Neill v. Davis, 721 F.Supp. 1013 (N.D.Ill.1989) and Newton v. Van Otterloo, 756 F.Supp. 1121 (N.D.Ind.1991), the courts, without any clear analysis, summarily treated the right to vote the ESOP shares as a plan asset and, having accepted that premise, determined that exercising the right constituted a fiduciary act implicating the fiduciary duties imposed under ERISA. However, these cases are distinguishable on an important point. Although both O'Neill and Newton concerned entrenched management (in both cases, most or all of the members of the corporate board of directors were also fiduciaries of the ESOP plans), the acts complained of in these cases involved more than merely electing directors in a regular annual shareholders' election. The District Court in the instant case characterized this distinguishing feature as "entrenchment plus".
 
 
 56
 O'Neill involved an effort to fire the plaintiff, who was a member of management and a plan participant, and deny him severance benefits. In that case, the plaintiff, Thomas O'Neill, was the chief executive officer and a director of Lester B. Knight and Associates, Inc., ("Knight") and a participant in the company Employee Stock Ownership Plan. The ESOP controlled approximately 90% of the company's shares. From December 1985 until April 17, 1987, O'Neill co-managed the company with the defendants who were the other four members of the Board of Directors (collectively referred to as the "Davis Group"). Each member of the Knight Board of Directors also acted as a trustee of the company ESOP.
 
 
 57
 On April 17, 1987, the Davis Group, without notice to O'Neill or a meeting of the board of directors or the shareholders, decided among themselves to vote the shares controlled by the ESOP to reconstitute the board of directors, and remove O'Neill from the Board and from his position as an ESOP trustee, and terminate his employment with the company.
 
 
 58
 Newton arose out of a proxy fight to manipulate the voting of ESOP. The case involved the South Bend Lathe corporation's ESOP. SBL's management comprised a majority of the ESOP Committee which was responsible for directing the ESOP trustee's voting of shares. At the urging of SBL's then president and board member, John Van Otterloo, who owned 18% of SBL's outstanding stock, the "entrenched" majority of the ESOP Committee decided not to solicit proxies from SBL retirees in the 1989 annual shareholder election, and directed the Plan trustee not to vote those non-voting shares. The agenda for the 1989 shareholders' meeting included consideration of a proposed new slate of directors.
 
 
 59
 As a result of the decision not to solicit proxies from retirees and the instruction to the trustee not to vote those shares, 70% of the ESOP-held shares were not voted. The ESOP participants' shares that were voted were not enough to overcome Van Otterloo's own 5,000 shares to re-elect himself and the then incumbent slate to the Board of Directors.
 
 
 60
 Under the circumstances presented in these two cases, the courts found sufficient allegation of breach of fiduciary duty. However, the Newton court explicitly recognized that "[d]ual capacity and self-selection alone do not raise a claim for breach of fiduciary duty." 756 F.Supp. at 1127, 1128.
 
 
 61
 By contrast, the voting of the ESOP shares in the instant case did not involve any control dispute among the board of directors; rather the elections of the NAC directors were nothing more than the normal, uncontested, "course of affairs" annual elections.
 
 
 62
 Although this Circuit has not specifically dealt with the issue of whether the mere right to vote an ESOP plan's stock constitutes an ERISA plan asset, in Kuper v. Iovenko, 66 F.3d 1447 (6th Cir.1995), we did note that one key exception carved out by Congress for ESOPs with respect to ERISA is the fiduciary's relief from the Act's "strict prohibitions against self-dealing, that is 'dealing with the assets of the plan in his own interest or for his own account.' " Id. at 1458, citing Martin v. Feilen, 965 F.2d 660, 665 (8th Cir.1992), cert. denied, 506 U.S. 1054, 113 S.Ct. 979, 122 L.Ed.2d 133 (1993).
 
 
 63
 Observing that the clear weight of case authority indicates that the focus of ERISA is a fiduciary's duties regarding the investment of plan assets (see, e.g., Kuper, supra, 66 F.3d at 1457-60; Moench v. Robertson, 62 F.3d 553, 568-72 (3rd Cir.1995), cert. denied, 516 U.S. 1115, 116 S.Ct. 917, 133 L.Ed.2d 847 (1996); Ershick v. United Missouri Bank, 948 F.2d 660, 666-67 (10th Cir.1991); Leigh v. Engle, 727 F.2d 113, 124-36 (7th Cir.1984)), the District Court in the instant action determined that "[t]he investment of an asset implies the asset must have some sort of inherent value, be capable of the assignment of value, or otherwise be subject to market forces."
 
 
 64
 The District Court further noted that case authority also establishes that "purely business decisions by an ERISA employer are not governed by section 1104's fiduciary standards." 946 F.Supp. at 549. See generally, Kuper, supra, 66 F.3d at 1456. As such, "ERISA does not prohibit an employer from acting in accordance with his interests as an employer when not administering the plan or investing the assets." Hickman v. Tosco Corp., 840 F.2d 564, 566 (8th Cir.1988). In fact, in Hickman, the Eighth Circuit specifically observed that "day-to-day corporate business transactions, which may have a collateral effect on prospective, contingent employee benefits [do not have to] be performed solely in the interest of plan participants." In Martin v. Feilen supra, the court concluded that Hickman applied to ESOPs, noting that "[v]irtually all of an employer's significant business decisions affect the value of its stock, and therefore the benefits that ESOP plan participants will ultimately receive." 965 F.2d at 666 (observing that section 1104 only applies to "transactions that involve investing the ESOP's assets or administering the plan.")
 
 
 65
 Further, we have held that a company does not act in a fiduciary capacity when deciding to amend or terminate an ERISA benefits plan. Adams v. Avondale Industries, Inc., 905 F.2d 943, 947 (6th Cir.1990), cert. denied, 498 U.S. 984, 111 S.Ct. 517, 112 L.Ed.2d 529 (1990). See also, Bryant v. International Fruit Prod. Co., 886 F.2d 132, 134 (6th Cir.1989) (holding that plan trustees do not breach their fiduciary duty by failing to reverse a company's decision to amend an ERISA plan); Musto v. American General Corp., 861 F.2d 897, 911 (6th Cir.1988), cert. denied, 490 U.S. 1020, 109 S.Ct. 1745, 104 L.Ed.2d 182 (1989) (deciding what a plan's terms should be does not implicate a fiduciary duty).
 
 
 66
 Applying the foregoing authorities, the District Court concluded:
 
 
 67
 Considering that Congress specifically authorized members of management to serve as fiduciaries, the Court is unwilling, in the absence of specific direction from the appellate courts, to find a cause of action premised solely on fiduciaries either voting for themselves or directing a trustee to vote for them. The Court, in view of its interpretation of O'Neill and [Newton v.] Van Otterloo requires some allegation in the complaint implicating an abuse or breach of fiduciary duties other than establishing or maintaining a corporate structure clearly envisioned and authorized by Congress.
 
 
 68
 Since Count I of the complaint does not allege anything more than "corporate entrenchment", and since Plaintiffs have not shown voting on ESOP' Plan's shares is a plan asset, the Court finds Count I does not state a claim for which relief can be given.
 
 
 69
 946 F.Supp. at 551.
 
 
 70
 The Department of Labor in its amicus brief urges us to hold that in all circumstances ESOP stock voting rights, as a matter of law, constitute an ERISA plan asset. We decline this invitation to so broad a declaration. Rather, we find the District Court's focus on the purpose for which the voting right is exercised to be the more persuasive approach. Here, the ESOP administrative committee members exercised their voting rights simply to direct the Trustee how to vote in a regular annual election of the corporation's board of directors. That they did this to elect themselves to the board is irrelevant since ERISA specifically anticipates and authorizes the "dual role" of directors and plan fiduciaries in the ESOP context. The plain language of § 1108(c)(3) makes clear that Congress intended that small companies ought to be able to have managers run their ESOPs and vice-versa. Moreover, unlike the "secret" board of directors vote in O'Neill or the intentional proxy manipulation to preclude consideration of a new slate of directors in Newton, the slate in the NAC election was unopposed and the vote of the committee to direct the Trustee to vote for the slate was unanimous. In fact, Plaintiff Grindstaff also voted to direct the Trustee to elect the Defendants to the board.
 
 
 71
 In the final analysis, this dispute was more about corporate control than about the value of retirement funds or plan assets and the fiduciaries' handling of these matters. The dispute began as a contract dispute over "pass through voting" in the context of labor-management negotiations and blossomed into pension rights litigation only after the employees were unable to prevail on their position at the bargaining table. The fact that stock voting rights may, in some way, ultimately implicate the management of plan assets and their value does not automatically mean that stock voting rights are a plan asset. Given the hybrid nature of ESOPs and the inherent tensions between partial employee ownership of a corporation through its stock and management of the corporation in its day-to-day affairs by management personnel, such disputes over stock voting rights are inevitable. But that does not render the voting rights an asset of a pension plan--stock voting rights are simply an aspect of corporate control, one aspect of which is management of retirement plan assets. Viewed in this context, we cannot say that the mere voting of an ESOP's stock by incumbent directors to perpetuate their own incumbency constitutes a breach of an ERISA fiduciary's duty in the handling of a "plan asset." Put another way, the right to vote, or direct the voting of an ESOP's shares, even when used to perpetrate one's own incumbency, does not, by itself, constitute a plan asset.
 
 
 72
 For these reasons, the District Court's dismissal of Plaintiffs' claims concerning the exercise of stock voting rights in Counts I, III, V, VI and VII is affirmed.
 
 
 73
 C. DISMISSAL OF PLAINTIFFS' CLAIMS CONCERNING THE REJECTION OF PASS THROUGH VOTING SHOULD ALSO BE AFFIRMED
 
 
 74
 Plaintiffs also argue that the ESOP Committee members (who constitute the majority of the NAC Board of Directors) are in violation of the ERISA fiduciary duties with respect to the ESOP in voting, in their capacity as members of the corporate Board of Directors, to reject the union's pass-through voting proposal. Plaintiffs argue that the Defendants would not agree to pass-through voting because that would result in their ultimate removal from office by the ESOP participants voting their own shares.[6]
 
 
 75
 In our view, this is simply a re-casting of the Plaintiffs' "stock-voting-rights-equals-plan-assets" argument taken to its next consequent step, i.e., the result of the Defendants' exercise of their stock voting rights was the rejection of pass-through voting in their capacity as re-elected Directors. Here, however, there is an additional element: Adoption of passthrough voting would effectively amend the existing ESOP plan in that the Plan itself defines voting rights. We have consistently held that a company does not act in a fiduciary capacity when deciding whether to amend or terminate an ERISA benefits plan. Adams, supra; Bryant, supra; Musto, supra.
 
 
 76
 These cases make clear that ERISA fiduciary duties are not implicated when deciding what a plan's terms, including voting rights, should be. Pass-through voting was a proposal to change the terms of the ESOP Plan. Moreover, "the tasks of administration [of an ERISA plan] do not extend to negotiating terms of the collective bargaining agreement." See United Ind. Flight Officers v. United Air Lines, 756 F.2d 1262 (7th Cir.1985). See also, Lea v. Republic Airlines, 903 F.2d 624 (9th Cir.1990). And, as noted, the proposal for pass-through voting was made during negotiations over a collective bargaining agreement.[7]
 
 
 77
 Accordingly, the District Court correctly found that Plaintiffs' failed to state a claim with respect to the pass-through voting proposal. Therefore, the District Court's dismissal of Plaintiffs claims in Counts IV, V, VI, and VII concerning this issue is also affirmed.
 
 
 78
 D. PLAINTIFFS' CLAIM AGAINST THE ESOP TRUSTEE, FIRST AMERICAN NATIONAL BANK WAS PROPERLY DISMISSED
 
 
 79
 Plaintiffs seek to ascribe to Defendant First National Bank, the directed ESOP trustee, a duty to investigate the merits of any directives given to it by the ESOP Administrative Committee.[8] However, as indicated, First American is a directed trustee and is not a fiduciary to the extent it does not control the "management or disposition" of the ESOP stock it holds in trust. See Maniace v. Commerce Bank of Kansas City, 40 F.3d 264, 267 (8th Cir.1994), cert. denied, 514 U.S. 1111, 115 S.Ct. 1964, 131 L.Ed.2d 854 (1995). "A person is a fiduciary only with respect to those aspects of the plan over which he exercises authority or control." Sommers Drug Stores v. Corrigan Enterprises, Inc., 793 F.2d 1456, 1459-60 (5th Cir.1986), cert. denied, 479 U.S. 1034, 107 S.Ct. 884, 93 L.Ed.2d 837 (1987). First American "had no discretion [pertaining to voting the ESOP stock] and could only act at the direction of the [ESOP Administrative] Committee." Id.
 
 
 80
 For these reasons, we find that the District Court correctly determined that Plaintiffs' claim that the Bank breached a fiduciary duty to investigate was without legal merit.
 
 CONCLUSION
 
 81
 For all of the foregoing reasons, the District Court's decision is AFFIRMED in all respects.
 
 
 82
 KRUPANSKY, Circuit Judge, dissenting.
 
 
 83
 A novel dispute in this circuit has arisen from the facts alleged in the plaintiffs' complaint. Cases of first impression invariably present difficult matters for courts because the prevailing notions of guidance upon which they must rely are absent. See Kroger Co. v. NLRB, 647 F.2d 634, 639 n. 6 (6th Cir.1980). In this instance, I am prompted to dissent because I believe that by unduly deferring to the legal conclusions of the district court, and failing to read the complaint in the light most favorable to the plaintiffs, the majority has reached an erroneous conclusion that erodes the rights which the Employee Retirement Income Security Act was enacted to protect.
 
 
 84
 It should initially be noted that this appellate review confronts the proper disposition of a defendant's motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6) and (c). A complaint will survive such a motion as long as it " ' "contain[s] either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." ' " Scheid v. Fanny Farmer Candy Shops, Inc., 859 F.2d 434, 436 (6th Cir.1988) (quoting Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1106 (7th Cir.1984), cert. denied, 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985)) (emphasis in original). "[S]urvival of an action after a Fed.R.Civ.P. 12(b)(6) [or (c) ] motion to dismiss ... has a lesser evidentiary and legal burden on a defendant than a summary judgment motion...." Runfola & Assocs., Inc., v. Spectrum Reporting II, Inc., 88 F.3d 368, 374 (6th Cir.1996) (per curiam). "[A]ll of the allegations contained in the plaintiff's complaint are accepted as true, and the complaint is construed liberally in favor of the party opposing the motion." Miller v. Currie, 50 F.3d 373, 377 (6th Cir.1995). The district court's consideration of these matters is not entitled to any deference; this court must review the complaint anew. Taxpayers United for Assessment Cuts v. Austin, 994 F.2d 291, 296 (6th cir.1993). The relevant query becomes whether the facts alleged in the complaint, when read in the best possible light, state a claim cognizable in federal court. See Miller, 50 F.3d at 377. A comprehensive discussion of the salient facts regarded in this manner follows.
 
 
 85
 In 1985, North American Rayon Corporation ("NAR") was a closely held corporation engaged in the manufacture of rayon at its Elizabethton, Tennessee facility. It employed hourly workers affiliated with United Textile Workers of America ("UTWA"), and its subordinate local union chapters, which had procured a valid collective bargaining agreement ("CBA") between NAR and its laborers. Because that year presented severe economic circumstances, NAR twice requested UTWA to make significant modifications in the CBA. Membership votes denied concessions on both occasions. J.A. at 16-17.
 
 
 86
 In late March, NAR advised UTWA that unless the modifications it requested were effectuated, the company would be constrained to close its doors and cease manufacturing rayon by the second week of June. After consideration, on March 31, 1985, UTWA imposed a trusteeship over Local Union No. 2207, and executed a CBA resulting in the loss of a $0.28 hourly wage increase that would have taken effect the next day, seven paid holidays, and ten percent of the contemporary wage rate. Local Union No. 2614 was not subject to this trust. At the time, UTWA advised members of Local Union Nos. 2207 and 2614, who had voluntarily agreed to these concessions, that it would work with NAR to "negotiate a contract and an employee ownership agreement which would render the sacrifice made by the membership of both Locals, in the short term, beneficial in the long term." J.A. at 17.
 
 
 87
 During the trusteeship, which lasted exactly one year, UTWA and NAR agreed to create an Employee Stock Ownership Plan ("ESOP"). An ESOP is "a tax-qualified employee benefit plan designed to enable employees to acquire stock ownership interests in their employers." Note, The Employee As Investor: The Case for Universal Application of the Federal Securities Laws to Employee Stock Ownership Plans, 34 Wm. & Mary L.Rev. 189, 208 (1992). NAR consulted Kelso & Company in the formation of its ESOP. See J.A. at 40.
 
 
 88
 The plan adopted by NAR provided that eighty-five percent of its stock would be held in trust for both hourly and salaried NAR employees. The remaining fifteen percent of the stock would be given to NAR management to induce them to continue their association with the troubled company, and as a "bonus" for their participation with NAR during its economic adversity. J.A. at 17.
 
 
 89
 While promulgating the ESOP, NAR made both oral and written representations to its employees that "at all times a representative of the UTWA would sit on the Board of Directors of the ESOP Company, thereby insuring hourly employee owners of the company access to financial and other information concerning the status and well being of the company, including all information of the nature and quality usually accessible to a corporate director." J.A. at 19. The company announced the ESOP in December 1985, and reached a new CBA with UTWA. Local Union No. 2207, placed under trust at that time, did not hold a vote to ratify the new CBA. J.A. at 17.
 
 
 90
 In 1990, the ESOP Administrative Committee included Karl Grindstaff ("Grindstaff"), Charles Green ("Green"), and Anthony Butts ("Butts"). Grindstaff also served as a union officer. Green and Butts were members of NAR's Board of Directors: Green was the President of the company, and Butts was his vice-president. During that year, a majority of NAR's five-member Board, including Green and Butts, worked with the ESOP Administrative Committee and "voted to restructure the corporate entity and create a 'holding company' " known as North American Corporation ("NAC"). This new organization was designed for governance by a three-person Board of Directors. J.A. at 19. Green and Butts exerted their substantial influence to direct the ESOP Trustee, First American National Bank ("First American"), to elect both of them and John Anderson--at that time also a Director of NAR--as NAC's initial Directors. J.A. at 20. This had the effect of endowing Green, Butts, and John Anderson with exclusive control over the ESOP because "the corporation ... designating membership on the ESOP Administrative Committee [wa]s no longer [NAR], but [NAC]." J.A. at 20.
 
 
 91
 Later that year, the NAC Board of Directors expanded to include five members, but it is unclear from the complaint how the ESOP Administrative Committee directed First American to vote the NAC shares held in trust for the employees. J.A. at 20. It is not clear who it elected to the expanded Board of Directors at that time. Regardless, in February 1991, more than 860 employee owners of NAC executed a document that requested the NAC Directors to amend the ESOP "to provide that each participant instruct the ESOP Administrative Committee as to the manner in which shares of company stock ... be voted," or to hold a Special Meeting of the stockholders for the purpose of adopting such an amendment. J.A. at 21.
 
 
 92
 In order to compel one of these methods to endorse "pass through voting," some of the employee owners filed an action in federal district court. J.A. at 21. As a result of the settlement discussion which ensued, the parties filed a notice of voluntary dismissal pursuant to Fed.R.Civ.P. 41(a)(1)(ii).
 
 
 93
 The settlement agreement achieved provided that the majority of NAC's Board of Directors "should come from 'outside the corporation.' " J.A. at 22. Green and Butts remained on the Board. The three "outsiders" appointed included William E. Anderson, Esq. ("Anderson"), the replacement for and son of John Anderson. Anderson had served as NAR's chief Labor Relations Negotiator and Counsel to both NAR and NAC. David Henry ("Henry"), "an old business friend and colleague" of Green also joined the NAC Board. The employees of NAR were permitted to elect the final member of NAC's Board, but Corporate Bylaws limited their representative's tenure to two consecutive one-year terms, after which time another candidate would have to replace the original. Raymond Broyles served in this capacity at the time Plaintiffs filed the instant complaint. J.A. at 22.
 
 
 94
 It is not clear what happened during the next three years. All the court can glean from the complaint is that on September 29, 1994, NAR and UTWA attempted to join in a new CBA. J.A. at 22.
 
 
 95
 UTWA offered to take back to its membership in a "positive manner" each and every contract modification advanced by NAR[ ] for the new collective bargaining agreements on the condition the ESOP Trust Agreement and the Charter of [NAC] be amended to provide for pass-through voting rights for all employee owners of NAC, and to allow the employee owners to vote their stock in NAC.... [After considering this offer] Anderson announced all five (5) directors opposed the offer to settle the contract on the condition employee owners were given pass-through voting rights.
 
 
 96
 J.A. at 22-23.[1] Frustrated by this rejection, the management's entrenchment in NAC's Board of Directors in apparent contravention of its representations in 1985 and the 1991 settlement agreement, and a 300 percent increase in Green's salary since 1985 despite any increase in real hourly wages for the workers during the same period, the local unions engaged in a strike through October and November. See J.A. at 22-23.
 
 
 97
 The end of the strike did not produce a CBA, and did not heal the wounds it had opened. "The strike resulted in the loss of jobs of many employee owners, and the expenditure of thousands of NAC dollars...." J.A. at 24. NAC built a fence around the manufacturing structure, provided twenty-four hour body guards for Green, Butts, Green's wife, their property, and hired the services of "attack dogs." J.A. at 24.
 
 
 98
 As a result of these and other developments,[2] Grindstaff, both individually and as a member of the NAR/NAC ESOP Administrative Committee, joined a group of employee owners of NAR/NAC serving as class representatives, and the UTWA, ARL-CIP, CLC and its subordinate unincorporated labor organizations (collectively "Plaintiffs"), to file a complaint in federal court. Plaintiffs' complaint related the facts discussed above, named Green, Butts, Henry, Anderson, and the corporate entities as Defendants, and alleged that Defendants had rejected the union's proposal for pass-through voting because they were fearful that certain relationships between the company and them "would be severed if NAR[ ] employees were allowed to vote their NAC stock and elect Directors of their choosing." J.A. at 23. Specifically, certain contracts and lease agreements that had been secured by the Directors and that governed relationships between NAC, NAR and other companies owned in whole or in part by the Directors would be threatened. J.A. at 24. On the basis of these allegations and the facts recited above, Plaintiffs sought redress through seven counts pursuant to the Employee Retirement Income Security Act ("ERISA"), codified at 29 U.S.C. §§ 1001 et seq. Plaintiffs also included a supplemental state law claim as an eighth count in their complaint.
 
 
 99
 Upon motion, the district court dismissed all counts purportedly anchored to ERISA pursuant to Fed.R.Civ.P. 12(b)(6) and (c), for their failure to state a claim upon which relief could be granted. The court also sua sponte dismissed Plaintiffs' supplemental state law claim pursuant to 28 U.S.C. § 1367(c)(3). Grindstaff v. Green, 946 F.Supp. 540 (E.D.Tenn.1996). Plaintiffs then filed a timely notice of appeal.
 
 
 100
 The issues joined before this court include:
 
 
 101
 (1) Whether the district court erroneously concluded that the fiduciary provisions of ERISA did not extend to the voting of corporate shares held by an ESOP because the exercise of that power was not an "asset" within the meaning of that statute; and
 
 
 102
 (2) Whether the district court improperly made factual determinations and inferences unfavorable to Plaintiffs.
 
 
 103
 The Supreme Court has described ERISA as a "comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans." Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 90, 103 S.Ct. 2890, 2896, 77 L.Ed.2d 490 (1983). To prevent employer raids of employee pension plans at the expense of worker security during retirement, Congress enacted ERISA to "establish[ ] standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and .... provid[e] for appropriate remedies, sanctions, and ready access to the Federal courts." 29 U.S.C. § 1001(b).
 
 
 104
 Although ERISA permits officers, agents, and other employer representatives to serve as fiduciaries of employee benefit plans, 29 U.S.C. § 1108(c)(3), as the majority has correctly observed, many provisions "specifically insulate the trust from the employer's interest." NLRB v. Amax Coal Co., 453 U.S. 322, 333, 101 S.Ct. 2789, 2796, 69 L.Ed.2d 672 (1981). For example, ERISA restricts asset distribution in all instances save plan termination, so that the assets "never inure to the benefit of any employer." 29 U.S.C. § 1103(c)(1). The statute directs that the trust "be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan." Id. It also ordains that the fiduciary chosen to monitor the plan must "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1).
 
 
 105
 Plaintiffs have asserted that the management entrenchment at NAC, which resulted in NAR's labor unrest, violated ERISA. They base this charge on the proposition that a fiduciary's power to direct a trustee to vote an ESOP's shares constitutes the management of an ESOP asset.
 
 
 106
 An ERISA fiduciary is responsible for "exercis[ing] any discretionary authority or discretionary control respecting management of [a] plan or exercis[ing] any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A)(i). Thus, the imprudent or disloyal exercise of the voting power, if it is characterized as the management of an asset, violates the statute. See, e.g., 29 U.S.C. § 1106(b). Although no forum in this circuit had considered this matter until the district court's adjudication of the instant case, Grindstaff, 946 F.Supp. at 547-51, two district courts outside this circuit had done so. See Newton v. Van Otterloo, 756 F.Supp. 1121, 1127-28 (N.D.Ind.1991); O'Neill v. Davis, 721 F.Supp. 1013, 1014-16 (N.D.Ill.1989).
 
 
 107
 In O'Neill, the district court denied a 12(b)(6) motion in response to a plaintiff's allegation that the trustees of an ESOP had "voted the pension plan shares of company stock to reconstitute the Board of Directors and to consolidate their control of the Company in violation of ERISA." O'Neill, 721 F.Supp. at 1014. The plaintiff had served as the chief operating officer of a company purchased mainly by debt financing. After the leveraged buy-out, the plaintiff became the company's chief executive officer, a director, and executed a new employment contract. "Plaintiff's employment contract provided that he could be fired with or without cause by a unanimous vote of the directors other than himself. However, if he were fired without cause, the Company was liable for severance benefits." Id. Unbeknownst to the plaintiff, the other directors surreptitiously convened, voted shares controlled by the ESOP, and stripped plaintiff of his status as a director. They proceeded to terminate his employment without cause, but avoided the pension obligation due to the unanimity of the newly elected board. Id.
 
 
 108
 After reviewing 29 U.S.C. § 1002(21)(A)(i), quoted above, the court explained that "the use of the disjunctive 'or' to connect the terms 'management' and 'disposition' makes plain [that] disposition of Plan assets is not necessary ... for the fiduciary duty to arise." Id. at 1015. Moreover, the court observed that although "a 'trustee has discretion whether and how to vote,' he must 'use proper care to promote the interest of the beneficiary.' " Id. (quoting Restatement (Second) of Trusts § 1993, comment a (1959)). On the basis of these basic legal axioms, the court concluded that "the voting of Plan-owned shares by the Plan's trustees was a fiduciary act under ERISA, and one which the trustees were bound to exercise in the sole interests of the Plan participants." Id. The defendants' motion for dismissal challenged the plaintiff's complaint for its purported failure to allege an injury to his interest in the ESOP, and argued that voting plan shares does not implicate any fiduciary duties. Id. Nevertheless, the court explained that any action "alleging breach of the duty to act solely for the interests of the [ESOP] participants, falls within the purview of [29 U.S.C. § 1132(a) ]," id. at 1016, which provides that "a civil action may be brought ... to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or ... to obtain other appropriate equitable relief." 29 U.S.C. § 1132(a); see 29 U.S.C. § 1104(a).
 
 
 109
 Van Otterloo similarly confronted a complaint in which the plaintiffs "contended that the trustees of an employee stock ownership trust had voted the trust's shares of company stock to reconstitute the company's board of directors and to consolidate their control of the company." Van Otterloo, 756 F.Supp. at 1128. The plaintiffs were four past and present employees of a company, dissatisfied with the alleged management entrenchment on the ESOP committee, and that committee's subsequent decision not to solicit proxies from all plan members. The defendants flatly denied any wrongdoing and accused the plaintiffs of pursuing "a labor-management dispute wearing ERISA clothing." Id. at 1124. On motion for summary judgment pursuant to Fed.R.Civ.P. 56, the district court resolved that mere management entrenchment was insufficient to proffer an ERISA violation as a matter of law. "Congress recognized that ERISA plans may be well-served by persons with intimate knowledge of other parties in interest." Id. at 1128 (citing 29 U.S.C. § 1108(c)(3)). Nevertheless, the court explained that "[a]s appointees of the management slate that was the subject of the shareholder vote, the Committee defendants had, at best, divided loyalties with respect to decisions on how to vote the ESOP's shares." Id. Noting this potential conflict, the court repeated the decree of Leigh v. Engle, 727 F.2d 113 (7th Cir.1984):
 
 
 110
 Where it might be possible to question the fiduciaries' loyalty, they are obliged at a minimum to engage in an intensive and scrupulous independent investigation of their options to insure that they act in the best interests of the plan beneficiaries.
 
 
 111
 Van Otterloo, 756 F.Supp. at 1128 (quoting Leigh, 727 F.2d at 125-26). The court therefore denied summary judgment on that basis.
 
 
 112
 After the district court in the case at bar had performed its own review of the guidance offered by these helpful opinions, it declined to "adopt[ ] or reject[ ]" their analysis. Grindstaff, 946 F.Supp. at 550. Instead, the court criticized the decisions by charging that "[w]ithout rigorous analysis, each court presupposed the voting of an ESOP Plan's shares to be a plan asset, without establishing exactly how or why that is so, and based the subsequent analysis upon that presupposition." Id. at 551. The panel majority has expressed agreement with this conclusion. Slip op. at 422. The panel majority has also approved of the district court's observation that
 
 
 113
 The clear weight of the case authority indicates ERISA focuses on a fiduciary's duties regarding the investment of plan assets. See Kuper [v. Iovenko], 66 F.3d [1447,] 1457-60 [ (6th Cir.1995) ] (analyzing the policies of diversification or liquidation of plan assets and the standard of review); Moench [v. Robertson], 62 F.3d [553,] 568-72 [ (3d Cir.1995) ] (analyzing the policies of diversification of plan assets and the standard of review)[, cert. denied, 516 U.S. 1115, 116 S.Ct. 917, 133 L.Ed.2d 847 (1996) ]; Maniace [v. Commerce Bank of Kansas City], 40 F.3d [264,] 267-69 [ (8th Cir.1994) ] (analyzing the role of a directed trustee and not finding a requirement of "weigh[ing] the merits of an investment")[, cert. denied, 514 U.S. 1111, 115 S.Ct. 1964, 131 L.Ed.2d 854 (1995) ]; Ershick v. United Missouri Bank, 948 F.2d 660, 666-67 (10th Cir.1991) (analyzing the role of a directed trustee and not finding a requirement of weighing the merits of an investment); Leigh v. Engle, 727 F.2d 113, 124-36 (7th Cir.1984) (analyzing the repercussions of a fiduciary's investments). The investment of an asset implies the asset must have some sort of inherent value, be capable of the assignment of value, or otherwise be subject to market forces.
 
 
 114
 Id. at 549; see slip op. at 423.
 
 
 115
 Although the majority has properly credited the district court for noting that precedent regarding ERISA cases "focuses on a fiduciary's duties regarding the investment of plan assets," and that "asset [s] must have some sort of inherent value, be capable of the assignment of value, or otherwise be subject to market forces," Grindstaff, 946 F.Supp. at 549 (emphasis added), neither statement diminishes the verity of the O'Neill court's recognition that "the use of the disjunctive 'or' to connect the terms 'management' and 'disposition' [in 29 U.S.C. § 1002(21)(A)(i) ] makes plain [that] disposition of Plan assets is not necessary ... for the fiduciary duty to arise." O'Neill, 721 F.Supp. at 1015.[3] Consequently, the district court's conclusion, which the panel majority has embraced, slip op. at 423, is misconceived.
 
 
 116
 Most complaints alleging a violation of fiduciary duties may well confront disputes over the propriety of certain investments of plan funds; but that does not foreclose a plaintiff's relief where he only asserts that a plan fiduciary has improperly managed a plan's assets. Cf. Mattei v. Mattei, 126 F.3d 794, 798, 804 (6th Cir.1997) (observing that although "the prohibitions [in section 1140] were aimed primarily at preventing unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights," the statute "reaches further than the employment relationship") (quoting West v. Butler, 621 F.2d 240, 245 (6th Cir.1980)). The controlling statute in this instance clearly states that fiduciaries are responsible for "exercis[ing] any discretionary authority or discretionary control respecting management of [a] plan or exercis[ing] any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A)(i) (emphases added).
 
 
 117
 For that matter, the district court's attack on the conclusion that the power to vote may be considered an asset within ERISA itself fails the test for "rigorous analysis," by merely repeating its incomprehension, Grindstaff, 946 F.Supp. at 549, 551, rather than attempting to resolve the matter one way or the other, id. at 550 (declining to adopt or reject the analysis). The majority's charge that O'Neill and Van Otterloo lack "any clear analysis" simply parrots this conclusion rather than elucidating a rationale for it. Admittedly, "ERISA does not expressly define the term 'assets of the plan,' " Acosta v. Pacific Enters., 950 F.2d 611, 620 (9th Cir.1991), and most of the circuit courts have yet to do so, providing little guidance to either this or the district court. Nevertheless, in their review of O'Neill and Van Otterloo, both the panel majority and the district court could have examined what the Ninth Circuit has said.
 
 
 118
 It is clear ... that "assets of the plan" is not defined in strictly financial terms, but rather is determined by examining whether the "item in question may be used to the benefit (financial or otherwise) of the fiduciary at the expense of plan participants or beneficiaries." In Acosta, the alleged "asset of the plan" was a participant-shareholder list. In Acosta, however, we did not reach the question of whether or not this list was a plan asset; rather we affirmed [a summary judgment for defendant trustees] on the ground that the fiduciaries' use of the list did not constitute self-dealing.[4
 
 
 119
 Kayes v. Pacific Lumber Co., 51 F.3d 1449, 1467 (9th Cir.) (citations omitted & footnote in original), cert. denied, 516 U.S. 914, 116 S.Ct. 301, 133 L.Ed.2d 206 (1995).
 
 
 120
 Noting that "Congress' overriding concern [in passing ERISA was] with the protection of plan participants and beneficiaries," the Ninth Circuit adopted a "functional test" to ascertain whether a good constitutes a plan asset. Id. at 1467. First, the court should consider whether the object "may be used to the benefit (financial or otherwise) of the fiduciary." Id. Second, the court should determine whether the use "is at the expense of the plan participants or beneficiaries." Id.
 
 
 121
 This broad analysis of the term "asset" in ERISA comports with the general practice of the courts of appeals in their construction of the protective provisions of the statute. See, e.g. Mattei, 126 F.3d at 804 ("[W]e believe that the words describing prohibited conduct partake of a collective meaning that is broader than might be found in the dictionary definition of any one of them."); Lowen v. Tower Asset Management, Inc., 829 F.2d 1209, 1213 (2d Cir.1987) ("[P]rotection of beneficiaries and notice to fiduciaries requires that [29 U.S.C. § 1106(b) ] be broadly construed...."), Leigh, 727 F.2d at 126 ("[T]he protective provisions of section [29 U.S.C. § 1106](a)(1)(D) and (b)(1) should be read broadly....").
 
 
 122
 Congress intended for the fiduciary principles of ERISA to codify much of the common law of trusts. See Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 110, 109 S.Ct. 948, 954, 103 L.Ed.2d 80 (1989). According to that source of law "[i]t is the duty of the trustee in voting shares of stock to use proper care to promote the interest of the beneficiary." Restatement (Second) of Trusts § 193, comment a (1959). Consequently, a legitimate broad construction of the term "asset" includes the power to "cast[ ] a vote." Id. Only by so reading the statute can the courts enforce congressional intent to protect ESOP participants and beneficiaries from imprudent and disloyal voting decisions made by the fiduciaries of their plans. Cf. Simpson v. Ernst & Young, 100 F.3d 436, 442-44 (6th Cir.1996) (applying the common law of agency and the "economic realities" test to prevent a small group of managers from depriving an individual stripped of any management authority, but denominated as a partner, from receiving his pension), cert. denied, --- U.S. ----, 117 S.Ct. 1862, 137 L.Ed.2d 1062 (1997).
 
 
 123
 Moreover, because the United States Department of Labor supports the proposition that voting rights are an asset of an ESOP, thereby creating a fiduciary duty in the way one votes plan shares, see generally Amicus Br. U.S. Dep't of Labor, this court has one more reason to reach the conclusion urged by Plaintiffs. After all, in Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the Supreme Court explained that "considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." Id. at 844, 104 S.Ct. at 2782. Unfortunately, the majority's rejection of the Department of Labor's opinion, slip op. at 17, ignores this call for deference without explanation.
 
 
 124
 As previously stated, the district court in the instant case declined to adopt or reject the analysis used in O'Neill, Van Otterloo, and that proposed above. See Grindstaff, 946 F.Supp. at 550. It explained that the underlying legal issue discussed in those cases and the foregoing analysis was irrelevant because Plaintiffs had failed to allege "an abuse or breach of fiduciary duties." Id. at 551. Specifically, the court properly observed that 29 U.S.C. § 1108(c)(3) permits officers, agents, and other employer representatives to serve as fiduciaries of employee benefit plans, id., and that the mere fact that a fiduciary "wear[s] two hats" does not create a per se violation of ERISA. Id. at 549 (quoting Kuper, 66 F.3d at 1458). Because both O'Neill and Van Otterloo concerned something more than management entrenchment--something the district court generally named "entrenchment plus," id. at 550--the district court's decision not to answer the statutory construction question made sense given its failure to find an allegation of fiduciary breach. Viewed from that vantage, the conclusion announced by both the district court and the majority appears correct. This manifestation is a deception.
 
 
 125
 Contrary to the majority's narrow reading of the complaint (which again mirrors that of the district court), the document clearly avers that the individual Defendants used their voting power to perpetuate contractual and lease agreements between NAC, NAR, and other businesses the individual Directors owned. J.A. at 23-24. By voting the ESOP's shares to entrench themselves and achieve this self-interested goal despite the foreseeable result (or risk) of labor unrest and other consequences that might diminish the value of NAR stock, the complaint alleges that Defendants acted at the expense of plan participants. This constitutes the "plus" element. As the Seventh Circuit has explained, "Where it might be possible to question the fiduciaries' loyalty, they are obliged at a minimum to engage in an intensive and scrupulous independent investigation of their options to insure that they act in the best interests of the plan beneficiaries." Leigh, 727 F.2d at 125-26. Because Defendants did not do even that, their actions as alleged in Plaintiffs' complaint stated a cause of action pursuant to ERISA and should not have been dismissed.
 
 
 126
 Ultimately, Defendants may be correct in their assertion that the election for NAC Directors was nothing other than a normal "course of affairs" election, and that "this is actually a labor dispute, thinly veiled as an ERISA claim." If so, they can prevail by using the appropriate tools provided in the Federal Rules of Civil Procedure, such as rule 56 (summary judgment) and 50 (directed verdict). Their chosen tool before the district court, however, was rule 12(b)(6), and that has required this court to take all allegations by Plaintiffs as true. Cf. Bracy v. Gramley, 520 U.S. 899, ----, 117 S.Ct. 1793, 1799, 138 L.Ed.2d 97 (1997) ("It may well be ... that petitioner will be unable to obtain evidence sufficient to support a finding of actual judicial bias in the trial of his case, but we hold that he has made a sufficient showing ... to establish "good cause" for discovery.") (habeas case).
 
 
 
 *
 The Honorable Gerald E. Rosen, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 The NAC Board of Directors consists of five directors, however, only four of the five directors are named as Defendants. Similarly, the NAR ESOP Committee consists of three members. Plaintiffs are suing only two of the three Committee members
 
 
 [2]
 After dismissing all of the federal claims, the court declined to exercise supplemental jurisdiction over Plaintiffs' one state law claim, and therefore, dismissed that claim, as well. 946 F.Supp. at 555
 
 
 [3]
 The Union-recommended third member of the ESOP Committee is Plaintiff Karl Grindstaff. At all times relevant in this action, Grindstaff was also a Union officer
 
 
 [4]
 As indicated, Defendants Green, Butts and Andersen also are Directors of NAR. The other two members of the NAR Board of Directors--Dr. Niles Schening and Dr. Glenn Yago--are not being sued in this action
 
 
 [5]
 In May of 1991, a lawsuit over the "pass through voting" issue was filed in the United States District Court for the Eastern District of Tennessee. In that action filed by the United Textile Workers, the union representing NAR/NAC employees, the plaintiffs sought a special meeting of the stockholders for the purpose of directing the NAC Board of Directors to amend the ESOP Plan to provide for pass through voting. At the time, NAC had a three-member Board of Directors. Two of the three members were the company's president Charles Green and vice-president, Tony Butts. The third member was an "outside" director, John Anderson. The lawsuit was settled in August 1991 with a settlement agreement under which NAC agreed to add two additional "outside", i.e., non-management, members to the Board, one of whom was to be elected by NAC employees. Thus, under this arrangement, voting control of the Board was no longer exclusively in the hands of NAC's management
 Plaintiffs do not dispute that NAC has complied with the "letter" of the settlement agreement, but they contend that Defendants have not complied with the "spirit" of the agreement because they claim that the two non-outside directors are friends of management and, hence, not impartial.
 
 
 [6]
 The Court notes that not only did the Defendant Board members vote against the pass-through voting proposal, but also, the union-recommended Board member, Raymond Broyles voted against it, as well
 
 
 [7]
 Furthermore, the record indicates that the Directors voted to reject pass-through voting because they were advised that the company's lenders would not agree to the proposal. As noted above, such business-related decisions are not governed by ERISA's fiduciary standards. Kuper v. Iovenko, supra
 Indeed, the Department of Labor concedes that Defendants' rejection of the union's pass-through voting proposal was a business decision and Plaintiffs' allegations relating to that decision do not state a legally cognizable ERISA breach of fiduciary duty claim. [See Department of Labor Amicus Brief, pp. 16-17.]
 
 
 [8]
 While this matter was pending before this court, by stipulation of the parties, First American National Bank was dismissed as an appellee on appeal
 
 
 [1]
 Plaintiffs' appellate brief has explained that the fifth Director of NAC, Raymond Broyles, resigned after Anderson had expressed that all five Directors had rejected the UTWA proposal. Appellant's Br. at 17 n. 3. The complaint is silent on this matter
 
 
 [2]
 In October 1994, UTWA requested certain corporate information from NAC, purportedly relying upon a Tennessee statute for authority. After being denied access to this material, Plaintiffs included one count of the violation of this statute in their complaint. The district court declined to address the merits of this matter, exercising discretion to dismiss it under the impression that the court had no original jurisdiction over the federal causes of action. Plaintiffs have not raised this matter in their appeal
 
 
 [3]
 Moreover, the district court's broad definition of the word "asset" actually supports the reading in O'Neill and Van Otterloo. Indeed, everything either has "some sort of inherent value, [is] capable of the assignment of value, or otherwise [is] subject to market forces." Id. at 549. According to neoclassical economics, scarcity always creates the capacity for a market value, and within the physical universe it is commonly accepted that all goods have a limited quantity. See infra text accompanying note 4
 
 
 [4]
 The only other case addressing the meaning of "assets of the plan" under [29 U.S.C. § 1106] is an Eleventh Circuit case which held that an employer's contingent and non-vested future retirement liabilities under a plan were not assets of the plan, and so could be used in the employer's own interest. Phillips v. Amoco Oil Co., 799 F.2d 1464, 1471 (11th Cir.1986), cert. denied, 481 U.S. 1016, 107 S.Ct. 1893, 95 L.Ed.2d 500 (1987)